**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-20-00045-01-PHX-DGC |
| Plaintiff, | **FINDINGS AND VERDICTS** |
| v. | |
| Carlos Devon Lewis, | |
| Defendant. | |

The Court held a bench trial in this case on September 29, September 30, October 1, and October 4, 2021. Although neither party requested findings under Federal Rule of Criminal Procedure 23(c), the Court will set forth the findings that support its verdicts. The Court will also provide findings on two other trial-related issues.

**I.     The Charged Bank Robberies.**

Defendant is charged with the armed robbery of three banks: a Bank of America branch in Surprise, Arizona, on September 24, 2019 (Count 1); a Bank of America branch in Peoria, Arizona on October 29, 2019 (Count 2); and a BBVA Bank in Phoenix, Arizona on December 18, 2019 (Count 3). *See* Doc. 49. The Court will address these robberies in reverse chronological order, which will allow for an easier explanation of the findings.

**A.     Count 3 – December 18, 2019, BBVA Bank Robbery.**

Defendant is charged in Count 3 with robbing a BBVA Bank branch located at 3202 East Bell Road in Phoenix, Arizona, on December 18, 2019. Doc. 49 at 2. The robbery was captured on several bank video cameras. Exs. 56-59. Video footage shows that two

robbers, one male and one female, entered the bank covered from head to toe in dark clothing, including hoodies, face masks, and gloves. The female robber paced around the lobby, pointing a dark handgun at people in the bank and commanding them to stay down, while the male robber leaped over the teller counter, collected money from the teller drawers, placed it in a backpack secured on the front of his chest, leaped back over the counter, and fled with the gunwoman. A teller on duty identified the counter-leaping robber's shoes as white K-Swiss tennis shoes. The shoes are clearly visible in video footage from the bank. *See* Exs. 59b, 59d.

Nicholas Taylor, who was in the parking lot of the bank, saw the robbers arrive and depart in a white SUV, which he identified as either a GMC Envoy or a Chevrolet Trailblazer. Taylor testified that he was able to identify the vehicle precisely because he owned a similar vehicle and had towed cars for 16 years. Taylor observed a third person driving the vehicle and recorded its Michigan license plate number.

Law enforcement officers determined that the car was a white Chevrolet Trailblazer, which normally had an Arizona license plate and was registered to Defendant's sister, Chardonnay Lewis. Officers set up surveillance at Chardonnay's residence, and Defendant arrived there approximately four hours after the robbery. Ex. 75c. Defendant arrived in a Cadillac Escalade he had purchased in the last few months.

Officers followed Defendant after he left Chardonnay's residence on the afternoon of the robbery. Defendant drove to a laundromat where surveilling officers observed him wearing, and then removing, white K-Swiss tennis shoes. Ex. 82c. Officers continued to follow Defendant after he left the laundromat. While waiting to turn left at an intersection, Defendant opened his driver-side door and placed a pair of white tennis shoes on the median. Officers retrieved the shoes, which were white K-Swiss tennis shoes similar to those seen on Defendant in the laundromat and on the male robber in the video of the bank robbery. The shoes, which were admitted into evidence, are in good condition – not in a condition likely to be discarded. *See* Ex. 264.

When the robbers took cash from the BBVA Bank, they also seized a dye pack and bait bills. A bank employee testified that a dye pack, which is disguised to look like an ordinary stack of currency, explodes when it leaves the bank's premises, staining the surrounding currency with red dye. She further testified that certain bills with serial numbers recorded by the bank, referred to as "bait bills," are placed in teller drawers to enable the tracking and identification of bank robbers. *See* Ex. 62.

Defendant used dye-stained cash several times in the hours after the robbery. Officers followed him throughout the afternoon and evening of December 18, 2019, and through part of the day on December 19, 2019, before he was arrested. Money they retrieved from vending machines in the laundromat was stained pink from a red dye pack. Exs. 88h, 88i, 88k, 88m. Cash used by Defendant at a Ross store was also stained pink. Ex. 262. Cash used by Defendant at a casino that evening caused a bill validation error. A casino security employee testified that the error was triggered by use of a bill that was either counterfeit or contaminated by a foreign substance such as dye. Defendant and the woman he was with left the casino shortly after employees came to his slot machine to investigate, without waiting to retrieve the money he had placed in the machine.

Officers executed a search warrant at the home of Defendant's sister, where he went after the bank robbery, and found more dye-stained cash. Exs. 92f, 92h, 257. Additionally, the K-Swiss shoes Defendant left on the median earlier in the day contain pink staining on one of the laces consistent with a red dye pack explosion. Ex. 264.[1] After Defendant was arrested on December 19, 2019, officers obtained a warrant and searched his Cadillac Escalade, where they found $5,065 in cash, including cash stained pink from the red dye pack and two bait bills from the BBVA Bank. *See* Exs. 62, 126b, 126f, 126i, 248b, 258.

On the evening of December 18, 2019, Defendant rented a room at a Marriott Hotel in north Phoenix. The room was rented using his name and address, and a hotel employee testified that he would have been required to show a picture ID to check-in. Later that

---

[1] The evidence also showed that Defendant and a woman stopped at an Ace Hardware store on the afternoon after the robbery, where she purchased two cans of paint thinner, consistent with efforts to remove dye stains from the currency. Ex. 80.

- 3 -

evening, Defendant made two videos of himself and a woman displaying large amounts of cash. Exs. 217, 218. The background of the videos suggests they were made in the hotel room. *Compare* Exs. 95b, 217. In one of the videos, Defendant is wearing a dark face mask similar to that worn by the male robber in the bank robbery. Ex. 218. The videos were deleted the next morning. When officers searched the hotel room the next day, thousands of dollars in cash was found hidden under the couch, much of it stained pink by the dye pack explosion. Exs. 96c, 96e, 99a, 100a, 100b, 260. Officers also found the dark face mask worn by Defendant in the deleted video. Exs. 97d, 261.

Defendant's cell phone records for the night of December 18 also indicate that he conducted internet searches for bank robberies in Phoenix. These include searches for bank robbery warnings and Compass Bank, the former name of BBVA Bank (Ex. 220); "bank robberies with back packs in phoenix, az" (Ex. 221); and "back pack bandit bank robber" (Ex. 222). These searches show that Defendant clearly knew of the robbery committed earlier in the day at BBVA Bank and that it included use of a back pack.

Although the white Trailblazer used as the getaway vehicle was not found until much later – a few months before trial, in a salvage yard – law enforcement confirmed that it was registered to Defendant's sister. When her home was searched, officers found the Arizona license plate that should have been affixed to the Trailblazer and a Chevrolet key fob. Exs. 92a, 92b, 92c, 256, 270. Defendant's former girlfriend, Kendahl Shoemaker, also confirmed that Defendant's sister drove an all-white Trailblazer.

The government presented evidence that Defendant had access to a black handgun similar to the gun seen in the bank robbery video. Kendahl Shoemaker testified that she saw Defendant with a gun at his sister's house. Ms. Shoemaker, who owns guns herself, identified the gun Defendant possessed as a black 9mm. After Defendant was arrested and his Cadillac Escalade was released to Ms. Shoemaker, Defendant called her and instructed her to search beneath the car's center console. There she found a black 9mm handgun. She retrieved it from the Escalade, retained it for a time, and eventually discarded it in a dumpster. The government also presented two photographs Defendant took of himself

with a black handgun and a K-Swiss shoebox in the bathroom of his sister's home. Exs. 170, 171.

In sum, the evidence of Defendant's involvement in the BBVA Bank robbery is overwhelming. His sister's car was used in the robbery. The robber wore white K-Swiss tennis shoes identical to those Defendant was later seen wearing and discarding – shoes that have a lace stained pink by red dye. Defendant used dye-stained bills at multiple locations on the afternoon and evening after the robbery. His car contained a large amount of cash and even more dye-stained bills, as well as two bait bills taken from BBVA in the robbery. Defendant made two videos on the night of the robbery showing himself and a female displaying large amounts of cash and appearing to celebrate (his accomplice in the bank robbery was a female). He wore a dark face mask in one of the videos similar to the mask worn by the male robber, and the same mask was found in the hotel room he rented. Defendant conducted internet searches on the night of the robbery for information about bank robberies in Phoenix, including bank robberies that used a back pack and bank robberies at Compass Bank, the former name of BBVA Bank. And Defendant had access to a weapon like the dark handgun used in the robbery. The government also presented evidence that BBVA Bank was federally insured at the time of the December 18, 2019 robbery. Ex. 110.

As charged in Count 3, the Court finds that Defendant, through force, violence, and intimidation, took money belonging to BBVA Bank from the care, custody, control, management, and possession of the bank. The Court finds that the deposits of BBVA Bank were insured by the Federal Deposit Insurance Corporation. The Court finds that Defendant and his accomplice intentionally made a display of force that reasonably caused the bank tellers and others to fear bodily harm by using a handgun, and that they put in jeopardy the life of persons in the bank by the use of a dangerous weapon. Defendant is guilty of armed bank robbery as charged in Count 3, in violation of 18 U.S.C. § 2113(a) and (d). The Court further finds that Defendant, by the many facts found above, aided and

abetted commission of armed bank robbery by the woman and the driver who were his accomplices, in violation of 18 U.S.C. § 2.

**B.     Count 2 – October 29, 2019, Bank of America Robbery.**

Defendant is charged in Count 2 with robbing a Bank of America branch located at 25260 North Lake Pleasant Parkway in Peoria, Arizona, on October 29, 2019. Doc. 49 at 2.

This robbery was also captured on several video cameras at the bank. Exs. 36-40. The method of the robbery was very similar to the BBVA robbery charged in Count 3. Two robbers entered the bank on October 29, 2019, at about 4:30 p.m., dressed in dark clothing from head to foot, including hoodies, face masks, and gloves. One of the robbers wore a backpack on the front of his chest and leaped over the teller counter. The other robber remained in the lobby, pacing and pointing the gun at individuals, telling them to stay down. After cleaning out the teller drawers, the robber wearing the backpack leaped back over the counter and fled with the gunman. Exs. 36-40. Two bank employees concluded from his accent that the counter-jumping robber was African American, as is Defendant.

The getaway vehicle for this robbery was a silver Chrysler 200. Ex. 48. It was located the night of the robbery in a nearby parking lot. The vehicle was registered to Jermaine Walker, who was serving a prison term at the time and therefore could not have been involved in the robbery.

Jermaine Walker's brother, Derreck Walker, testified that he had access to the car while Jermaine was incarcerated and occasionally let others drive it. Prior to the robbery, an individual known as "Low" asked Derreck if he could borrow the car, and Derrick agreed. Instead of Low, Defendant arrived at Derrick's house on the morning of the robbery to borrow the car. Because Defendant was displaying a handgun in the belt of his trousers, Derreck felt threatened and let him take the car. Derreck testified that he believes the man who took the car arrived in a Cadillac Escalade driven by a woman. Defendant owned an Escalade. Derreck was unable to identify the person who borrowed the car in

the courtroom during trial, but he previously had identified him as the person on the right in the two photographs in Exhibit 51. The photo on the right was taken of Defendant after his arrest.[2]

Defendant knew Low, the person who initially asked Derrick to borrow the car that was used in the robbery. Kendahl Shoemaker testified that Low was a friend of Defendant's and that she saw him with Defendant on several occasions. She testified that Low once slept at their apartment overnight. Low's true name, Ruben Butler, was also found in a notebook seized from the hotel room searched after the BBVA robbery.

That Defendant borrowed the getaway car is further confirmed by data from his cellphone which shows that he searched for directions to 132 Ingraham Street – the address of Low's home, located only a quarter-mile from Derreck Walker's house – on the morning of the robbery. Ex. 174c. Cell site information also shows that Defendant's phone was near Derreck Walker's house between 9:30 and 10:00 that morning. Ex. 115h, 115i. The Court finds that Defendant procured the silver Chrysler 200 used in the robbery on October 29, 2019.

Data from Defendant's cellphone also shows that he searched for the location of a grocery store across the street from the Bank of America branch approximately two hours before the robbery. Ex. 174d. Cell site information shows that Defendant's cellphone used a cell tower close to the bank at 3:21 p.m. on October 29 – about one hour before the robbery – and then showed no activity between 4:03 p.m. and 5:07 p.m. – the period during which the robbery occurred. Ex. 115j. This suggests that Defendant's phone was either turned off or out of cell coverage between those times. Because of the ubiquity of cell towers in Phoenix and the location of the cell phone before and after these time periods, it is exceedingly unlikely that the cellphone was out of range of cell towers during the period of the bank robbery and more likely that it was turned off. A review of cell tower

---

[2] Derreck Walker did not disclose that he loaned the Chrysler 200 to a man with a gun until his second interview with law enforcement. He testified that he did not disclose this fact during his first interview because he was scared, and that he disclosed it in his second interview because he learned it was a crime to lie to law enforcement. The Court found this testimony credible.

- 7 -

information shows that Defendant's phone was in the vicinity of the Bank of America branch on only three dates between July 19 and October 31, 2019 – October 22 and 23, a few days before the robbery, and October 29, the day of the robbery. Ex. 115f. Following the robbery, cell tower information shows the cellphone moving south of the location of the robbery. Ex. 115k. And this is not the only cell phone evidence that connects Defendant to the Bank of America robbery. Soon after the BBVA Bank robbery on December 18, 2019, Defendant's cell phone records show that he searched for "back pack bandit bank robber" and "bank of america robberies in phoenix, az." Ex. 222.

Sara Villegas, an employee of the Bank of America branch, testified that she has been around guns all her life, owns guns, and owns a Glock handgun. She testified that the gun used by the robbers was a dark Glock 9mm handgun. As noted above, Defendant was seen in possession of a black 9mm handgun by Kendahl Shoemaker and had taken photos of himself with a dark handgun in the waistband of his trousers. Defendant also directed Ms. Shoemaker to retrieve a similar gun from his Escalade after the third robbery.

Images of the counter-jumping robber from the bank video system also implicate Defendant. Kendahl Shoemaker identified underwear worn by the robber – visible in a bank video as he jumped back over the counter – as underwear she had purchased for him and the only kind he would wear. Ex. 39c. Another image of the robber shows a large lump near the rear of his head, under his hoodie, consistent with the bun Defendant often made of his long, braided hair. *See* Exs. 40, 166, 167. Three days after the robbery, Defendant posted a photograph of himself with his hair in such a bun, holding a large stack of cash. Ex. 193. Ms. Shoemaker testified that Defendant's warehouse job did not produce the large amounts of cash she saw him with. This was confirmed by records of Defendant's earnings in late 2019. Ex. 205. When Ms. Shoemaker asked Defendant about the abundant cash he possessed, Defendant told her – more than once – that she could not testify about what she did not know.

The government has proven beyond a reasonable doubt that Defendant was involved in the Bank of America robbery on October 29, 2019. He procured the getaway vehicle by

displaying a firearm to Derreck Walker. He searched for a location across the street from the subject bank only two hours before the robbery, and cell tower information places his phone in the vicinity of the robbery shortly before it occurred. Videos from the robbery show the counter-jumping robber wearing underwear like Defendant's and having a large lump on the back of his head similar to the bun Defendant was known to wear. The method used during the robbery was very similar to the robbery on December 18, 2019 – two robbers entered the bank covered in dark clothing from head to toe; one leaped over the teller counter, cleaning out the teller drawers and placing the cash in a backpack on the front of his body; the other paced around the lobby and displayed a handgun; both robbers then fled in a getaway vehicle later found a short distance from the bank.[3] A handgun was used in the robbery similar to the dark 9mm handgun Defendant possessed. And Defendant posted a photograph of himself holding a large amount of cash three days after the robbery – cash that was unlikely to have been produced by his warehouse job. The government also presented evidence that Bank of America was federally insured at the time of the robbery. Exs. 107, 109, 111.

As charged in Count 2, the Court finds that Defendant, through force, violence, and intimidation, took money belonging to Bank of America from the care, custody, control, management, and possession of the bank. The Court finds that the deposits of Bank of America were insured by the Federal Deposit Insurance Corporation. The Court further finds that Defendant and his accomplice intentionally made a display of force that reasonably caused the bank tellers to fear bodily harm by using a handgun, and that they put in jeopardy the life of persons in the bank by use of a dangerous weapon. Defendant is guilty of armed bank robbery as charged in Count 2, in violation of 18 U.S.C. § 2113(a)

---

[3] The Court concludes that it may, under Rule 404(b), consider the similarities among the three robberies in this case as evidence of Defendant's involvement in each of the robberies. Rule 404(b) specifically provides that other act evidence can be used to prove identity – in this case the identity of Defendant as the counter-jumping robber – and the Ninth Circuit has approved such use of similar criminal activities. *See United States v. Cherer*, 513 F.3d 1150, 1157 (9th Cir. 2008) ("Cherer's prior conviction tends to prove his intent and his modus operandi."); *United States v. Dhingra*, 371 F.3d 557, 566–67 (9th Cir. 2004) (as amended) (allowing introduction of Rule 404(b) modus operandi evidence).

and (d).  The Court also finds that Defendant, by the many facts found above, aided and abetted commission of armed bank robbery by the robber who was his accomplice in the robbery, in violation of 18 U.S.C. § 2.

### C. Count 1 – September 24, 2019, Bank of America Robbery.

The robbery charged in Count 1 occurred on September 24, 2019, at a Bank of America branch located at 13780 West Waddell Road in Surprise, Arizona.  Doc. 49 at 1.

This robbery was captured on video (*see* Exs. 3, 4, 5, 7a-e, 8a-b), and was performed in a manner very similar to the other two robberies charged in the superseding indictment. Two individuals entered the bank shortly before 2:30 p.m., covered from head to toe in dark clothing, including hoodies, face masks, and gloves.  One had a backpack strapped to the front of his chest and was wearing white, lace-up tennis shoes similar in appearance to the K-Swiss shoes discussed above.  Ex. 7e.  This robber leaped over the teller counter and emptied the teller drawers into the backpack while the other robber paced around the lobby pointing a dark handgun at people and instructing them to stay down.  The gun appears similar to the handgun used in the other robberies.  Exs. 7c, 8a, 8b.  The counter-jumping robber then leaped over the counter again and the two fled from the bank to a getaway car in the parking lot.[4]

Jose Pina was in the parking lot about to enter the bank when the robbery occurred. He took a photograph of the vehicle in which the robbers arrived and fled.  Ex. 12.  He also recorded the license plate number – JK9058 – in his telephone.  As the robbers fled from the scene, Pina saw them turn north on 137th Avenue.  Pina provided the license plate number and photograph to law enforcement.

Shortly after the robbery, law enforcement received a call from a citizen who lived north of the bank reporting suspicious activity in her neighborhood.  An officer reported to the location on Ventura Street and found the getaway vehicle, a silver 2001 Nissan Sentra that matched the photograph and license plate number provided by Pina, parked along the

---

[4] As noted above, the Court may consider similarities between the three robberies as evidence of Defendant's identity and modus operandi under Rule 404(b).

curb. Officers obtained a warrant and placed a tracking device on the vehicle. On September 26, 2019, officers received an alert that the vehicle had moved. Officers followed the vehicle and found it contained Jaime Solomon and Sara Flores.

Sara Flores testified that she knows Jaime Solomon, is familiar with his Nissan Sentra, and was allowed to drive the car from time to time. She testified that she also knows Defendant. She met him at a gas station in Phoenix and thereafter saw him approximately once per week. Flores had Facebook communications with Defendant, including in the days before the robbery (Ex. 251), and knew him as "D," which she believes stands for "Detroit." Defendant is from Detroit. Flores identified Defendant in the courtroom and noted that she previously had identified him to law enforcement through a photograph marked as Exhibit 275. Flores testified that she was allowed to use Jaime's Nissan Sentra every weekend and that she let other people use it as well. Flores could not remember whether she had ever loaned the vehicle to Defendant, but the evidence was sufficient to prove that Defendant knew the woman who had access to and occasionally loaned the Nissan Sentra used as the getaway vehicle.[5]

The getaway vehicle was parked after the robbery in front of a house on Ventura Street that had a doorbell video camera. Video from the camera showed the getaway vehicle arriving, being parked in front of the residence, and three individuals jumping out, running across the street, and departing in an SUV that was parked on the other side of the street (the "switch vehicle"). Video surveillance also showed the switch vehicle being parked on the street before the robbery. The switch vehicle appears to be a Ford Expedition owned by Defendant's then-girlfriend, Kendah Shoemaker. Photographs of her vehicle (Exs. 20c, 21a) appear to match photographs of the switch vehicle on Ventura Street (Ex. 176b). Indeed, Ms. Shoemaker testified that when she saw the video from the house

---

[5] Flores previously provided statements to law enforcement officers about Defendant's use of the vehicle, but the Court found, for reasons stated on the record on October 4, 2021, that there was insufficient evidence of trustworthiness for these statements to be admissible under Rules 803(5) or 807. They have not been considered in this ruling.

- 11 -

on Ventura Street she was "shocked" because the switch vehicle appeared to be her Ford Expedition.

The government also presented cellphone data showing that Defendant used the Google Maps search tool to search the location of the bank at Litchfield and Waddell Roads on September 23, 2019, the day before the robbery. *See* Ex. 174a. Defendant's cell records also reflect that his cellphone used a cell tower near the bank the day before the robbery and that this was the only time Defendant's cellphone ever used this tower. Ex. 115c. Further, his cellphone records reflect no activity between 1:47 and 3:14 p.m. on the day of the robbery, meaning that the cellphone was either turned off or out of cell coverage. Ex. 115e. As noted above, it is very unlikely that the phone was out of cell coverage and likely that it was turned off during the period of the robbery.[6]

On September 25, 2019, the day after the robbery, Defendant's brother uploaded videos of himself and Defendant boastfully counting a large amount of cash in the back of a vehicle. *See* Exs. 234, 235. Six days after the robbery, Defendant paid $3,000 in cash as a down payment for a Mercedes Benz. Kendahl Shoemaker testified that she did not help him make this payment and that she filmed a video of Defendant, after the purchase, standing in front of the Mercedes and fanning a large handful of cash. *See* Ex. 172. As noted, Defendant's job at a warehouse was unlikely to have produced the kind of cash evident in the videos taken by Defendant's brother or his girlfriend. Although Defendant suggested during trial that the cash might have been "prop money," which he identified as fake cash, one of the videos filmed by Defendant's brother shows the cash closely and clearly suggests it is real. *See* Ex. 234. The cash in the video, unlike the cash in the demonstrative exhibit Defendant provided to illustrate fake money, does not contain the caption "Play Money." *Id.*

---

[6] The government presented evidence during trial from a Verizon cell account used by Defendant, but the certificate of authenticity provided by Verizon was not signed under oath or penalty of perjury. *See* Ex. 161. The Court therefore concluded that it did not satisfy Rule 902(11) and the records were not admissible under Rule 803(6). Although the government asserted that the defense had stipulated to the admissibility of the Verizon documents, the record on this point was ambiguous. As a result, the Court will not admit the Verizon records and has not considered them in reaching this decision.

Finally, as noted above, soon after the third robbery on December 18, 2019, Defendant's cell phone records show that he searched for back "pack bandit bank robber" and "bank of america robberies in phoenix, az." Ex. 222.

Count 1 presents a closer question than Counts 2 and 3, but the Court finds that the government has presented sufficient evidence to prove beyond a reasonable doubt that Defendant was involved in the Bank of America robbery on September 24, 2019. He knew the woman who had access to the getaway vehicle and loaned it to others from time to time, and he communicated with her in the days before the robbery. The switch vehicle belonged to his then-girlfriend, Kendahl Shoemaker. Defendant used the Google Maps tool to search the location of the bank at Litchfield and Waddell Roads on the day before the robbery, and his cell records reflect that his cellphone used a cell tower near the bank that day – the only time Defendant's cellphone ever used this tower. Videos from the robbery show the counter-jumping robber wearing white tennis shoes like those worn by Defendant in the third robbery and abandoned by him shortly thereafter.

And the method used during the September 24 robbery was very similar to the other two robberies – two robbers entered the bank covered in dark clothing from head to toe; one leaped over the teller counter, cleaning out the teller drawers and placing the cash in a backpack on the front of his body; the other paced around the lobby and displayed a handgun; both robbers then fled in a getaway vehicle later found abandoned a short distance from the bank. The handgun used in the robbery was similar to the dark 9mm gun Defendant possessed. Defendant's brother posted videos of himself and Defendant displaying a large amount of cash the day after the robbery – cash that would not be produced by Defendant's warehouse job. Defendant purchased a Mercedes Benz six days after the robbery and had his girlfriend record a video of him in front of it displaying a large amount of cash. After the third robbery on December 18, 2019, Defendant searched for "bank of america robberies in phoenix, az" and "back pack bandit bank robber." Finally, the government presented evidence that Bank of America was federally insured at the time of the robbery. Exs. 107, 109, 111.

As charged in Count 1, the Court finds that Defendant, through force, violence, and intimidation, took money belonging to Bank of America from the care, custody, control, management, and possession of the bank. The Court finds that the deposits of Bank of America were insured by the Federal Deposit Insurance Corporation. The Court further finds that Defendant and his accomplices intentionally made a display of force that reasonably caused the bank tellers and others to fear bodily harm by using a handgun, and that they put in jeopardy the life of persons in the bank by use of a dangerous weapon. Defendant is guilty of armed bank robbery as charged in Count 1, in violation of 18 U.S.C. § 2113(a) and (d). The Court also finds that Defendant, by the many facts found above, aided and abetted commission of armed bank robbery by the other robber and getaway driver who were his accomplices, in violation of 18 U.S.C. § 2.

## II.     Findings on Other Matters.

### A. Waiver of Jury Trial.

At the final pretrial conference on September 28, 2021, Defendant initially indicated that he wished to have a jury trial. The Court and parties proceeded to discuss a variety of issues related to the jury trial which was scheduled to start the next day. Near the close of the conference, Defendant, without prompting by the Court or prosecution, suggested that he wanted to revisit the question of waiving a jury trial. He asked the Court to explain the difference between a jury and bench trial, and the Court did so. Defendant asked a few additional questions. He then indicated that he wished to waive his right to a jury trial and proceed instead with a bench trial. The Court advised Defendant that such a waiver must be in writing, *see* Rule 23(a)(1), and suggested that Defendant discuss the issue further with standby counsel.

Additional matters were then addressed in the conference, after which Defendant stated that he did not need to discuss the matter further with standby counsel and that he wanted to waive his right to a jury trial. The Court read the waiver form to Defendant in open court, and he then signed it in open court. The Court asked standby counsel if he had discussed waiver of a jury trial with Defendant, and counsel stated that he had discussed it

at some length with Defendant before the final pretrial conference. Standby counsel confirmed that Defendant's waiver of a jury trial was voluntary, and signed the consent form. Counsel for the government also signed the form, as did the Court. *See* Doc. 122.

The Court finds that Defendant's waiver of his right to a jury trial was knowing and voluntary. He discussed the matter with standby counsel, heard an explanation from the Court, asked questions, stated his desire to waive a jury trial clearly on the record, and signed the written waiver form. The Court previously found Defendant competent to represent himself, and finds him competent to waive a jury trial.

### B. The Assistance of Standby Counsel.

Defendant was represented by attorney Magnus Eriksson for some time in this case. Earlier this year, Defendant stated his desire to represent himself. After receiving and understanding appropriate *Faretta* warnings, Defendant elected to represent himself and the Court appointed Mr. Eriksson to serve as standby counsel.

It is the Court's observation from trial that standby counsel was effective in providing assistance to Defendant. Although Defendant clearly controlled his defense and did most of the speaking during the trial, he consulted regularly with Mr. Eriksson throughout the course of the trial. Mr. Eriksson sat at counsel table with Defendant and conferred confidentially with him multiple times each day, often many times during the discussion of a particular subject or the examination of a particular witness. At times, Defendant asked Mr. Eriksson to make a particular point to the Court or ask a particular question of a witness, which Mr. Eriksson did.

The Court finds that Defendant's efforts to represent himself were coherent and thoughtful. Although he clearly is not trained as a lawyer and did not ask all of the questions or make all of the arguments that a skilled lawyer would have, it was evident to the Court that he understood the government's case, was alert and attentive throughout the trial, and questioned witnesses on relevant subjects. It also was apparent that he turned frequently to Mr. Eriksson for advice and assistance during the course of the trial. The

Court finds that Defendant's self-representation was knowing and voluntary and that standby counsel's assistance during trial was effective.

**IT IS ORDERED:**

1. The Court finds Defendant guilty of armed bank robbery as charged in Counts 1, 2, and 3 of the superseding indictment. 18 U.S.C. §2113(a), (d), and 2.
2. Defendant's oral Rule 29 motion, made at the close of the government's evidence, is denied for reasons set forth above.
3. Sentencing is scheduled for **December 22, 2021 at 2:15 p.m.** The probation department shall prepare a presentence investigation report.
4. As Defendant is representing himself in this case, the Court expects that he will represent himself at sentencing. If Defendant wishes to have Mr. Eriksson represent him at sentencing, he shall file a notice to this effect before the sentencing date. In any event, Mr. Eriksson will continue to act as standby counsel for Defendant through the sentencing.
5. Defendant is facing a supervised release violation charge in case CR-05-00755. The government shall work with Defendant and standby counsel and file a memorandum, within three weeks of this order, setting forth the parties' views on how the Court should proceed with the resolution of that charge.

Dated this 6th day of October, 2021.

*David G. Campbell*
David G. Campbell
Senior United States District Judge